UNTED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

JAMES T. PARKER, II and
DEBRA L. PARKER,

     **Plaintiffs,**

v.                                                           Civil Action No.: 4:18cv00140

**FREEDOM MORTGAGE**
**CORPORATION**, *et al.*,

     **Defendants.**

## PLAINTIFFS' REPLY IN SUPPORT
## OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs James T. Parker II and Debra Parker, by Counsel, submit the following Reply Memorandum in support of their Motion for Partial Summary Judgment.1

### I.    OVERVIEW

This case is set for trial to determine disputed issues of fact. The core fact issues the Court continues to see in the Parties' pleadings is: was Freedom Mortgage Corporation's ("Freedom") reporting that the Parkers were behind in paying their pre-Freedom property tax escrow accurate? There genuinely are not any MATERIAL facts in dispute on that question. The only evidence that Freedom will offer – that it has offered – is that Freedom *believed* that the Parkers were in default. It told the Parkers they were in default. And it reported that the Parkers were in default. That is

---

1 Freedom disparages Plaintiffs in its response brief for not filing this motion in the hectic runup to the last scheduled trial date. As Defendant knows, its own motion would not likely have been timely under the Scheduling Order as there would be no time for the motion to have been heard or considered before trial. Plaintiffs'' motion would have been similarly late, a delay necessitated by Freedom's refusal to produce its witnesses and documents during the Plaintiffs' discovery period.

really all there is in the face of written proof that the Parkers did not owe the Property tax upon which Freedom's escrow calculation was made, the repeated disputes from the Parkers, the settlement of a previous lawsuit and even an account credit that would have covered even the $540 (the number that Freedom changes) default amount claimed.

Given the mountain of papers filed on this question and the uncompromising positions taken by both sides, Plaintiffs ask the Court simply this: Allow a hearing on Summary Judgment. Ask Freedom's counsel: show the Court the document(s) or specific testimony that Defendant believes supports the claim that its escrow calculation was correct. There genuinely is no such document and will be no such evidence.

The second two issues on Plaintiffs' motions were made easier both by Defendant's response, as well as by its own positions on Freedom's Motion for Summary Judgment. The Court should start with the second liability basis first, argued at pages 27-31 of Plaintiffs' opening memorandum. (Doc. 131, at 27-31). Freedom violated the FCRA by falsely reporting to the consumer reporting agencies ("CRAs") in its investigation results that its reporting was not disputed. As this Court found in *Wood v. Credit One Bank*, where the "undisputed evidence, viewed in the light most favorable to" a creditor shows that "it continued to report [a consumer's] account in a manner that indicated his disputes had been resolved when, in fact, they had not," that creditor "violated 15 U.S.C. § 1681s–2(b)(1)(C) by failing to accurately report the results of its investigations of the Account to the Credit Reporting Agencies" and the " Court must grant [the consumer's] partial motion for summary judgment on that issue." 277 F. Supp. 3d 821, 851 (E.D. Va. 2017).

Freedom does not argue that point. It acknowledges in both its own motion and in response to Plaintiffs' motion that the only question for the Court to consider is whether "Freedom Mortgage

was not on notice of a bona fide dispute from Plaintiffs." (Doc. 144 at 9-10). Thus the only question is whether Freedom was on notice that the Plaintiffs' disputed its 2018 reporting that they were in default. The undisputed evidence is that Defendant received both written and telephonic disputes from the Parkers, including the actual copies of their FCRA dispute letters. If the Court finds that Freedom had received such disputes, there is literally no other opposition argument made by Defendant.

The second liability argument is also cleanly simple. Its reliance on (and inaccurate summaries of) out of Circuit cases aside, Freedom does not do substantive, searching investigation of consumer credit reporting disputes.

## II.   PLAINTIFFS' UNDISPUTED STATEMENT OF FACTS

Freedom does not meaningfully respond to Plaintiffs' identified materially undisputed facts. Instead, it cites to its attorney's earlier declaration and reasserts its conclusionary positions that the Parkers were in default because Freedom's account system said they were in default. Plaintiffs reply as follows:

1.   While Freedom claims to dispute the facts stated in Plaintiffs' Statement of Undisputed Facts ("SOF, ¶__"), its only actual basis for dispute is claim that the 2015 -2017 events and facts that led to 2018 events were somehow themselves released with the claims settled in 2017. But facts are not *claims* and certainly are not "released" by a settlement. Freedom is correct in offering that "Plaintiffs' Complaint is for FCRA and RESPA claims as a result of correspondence and credit reporting disputes sent to Freedom Mortgage in April 2018." They are claiming here for Freedom's misconduct as to how it handled its FCRA duties *in 2018* – its failure to conduct any investigation in 2018 and its inaccurate reporting thereafter. Put simply – as a way to help Freedom understand the logical problem with its position: imagine a defamation claim.

The plaintiff alleges in 2016 that defendant falsely published that he committed a crime in 2015. They settle the case in 2017. And then in 2018 the same defendant again publishes the same false statement that the plaintiff had committed a crime in 2015. Yes, the settlement is relevant, but not in the way Freedom suggests as it speaks directly to the willfulness of Defendant's 2018 misconduct.

Freedom's only other basis for disputing these facts is its point that the "Plaintiffs were advised in December 2015" that Freedom's internal system concluded "that as a result of an escrow deficiency from both tax payments and under-collection of escrow [also tax payments] by the prior servicer, their monthly payment was increasing from $778.29 to $1,196.96 effective February 1, 2016." That Freedom's internal system notified the Parkers of this conclusion is neither remarkable nor material – it is in fact the very point of this case: Freedom continued to rely on its internal system even when it was shown to be objectively wrong.[2]

2. Plaintiffs attached and cited Freedom's actual Rule 30(b)(6) testimony. The entire transcript text discussing this issue is attached. Defendant's claim that the statements cited verbatim are somehow incorrect is remarkable.[3] Plaintiffs' stated facts are undisputed.

3. Freedom also disputes Plaintiffs' statement that Defendant has never explained where the pre-2016 "escrow shortage" came from. Its dispute is a perfect example of the immaterial nature of Defendant's opposition. Its explanation is circular. Its cited explanation is simply that the asserted underpayment came because Ocwen did not correctly calculate the

---

[2] The Parkers' frustration with Freedom is understandable. Even now after two federal lawsuits, Defendant's devotion and unwavering faith in its internal system's summary forms the entire basis for its defense, even in the face of payment receipts, tax exemption documents and contrary conclusions from the Freedom agents who themselves agreed with the Parkers.

[3] Sensibly, Freedom does not dispute that it is bound by its Rule 30(b)(6) testimony.

Parkers' tax payment obligation. But the point is that Freedom can never go further with such explanation. Which tax bill? For what amount? To what government agency? For what month or year?

As a dispute, Freedom again identifies the same testimony of its litigation paralegal, Tanya Tarver, upon which it relied in its own summary judgment reply. *See* Dkt No. 96, Ex. 3 at 51:13-17; 52:21-54:5; 62:16- 63:6. There, the Rule 30(b)(1) witness tried to explain why the Parkers were reported as in default. The best she could do was point to her belief that the previous servicer must have made an error in failing to collect property tax. Nothing more that this assertion – unsupported by any other evidence and rebutted entirely by the actual tax record. The Court will reach the same unvarnished conclusion from its review of the excerpt Freedom offers.

4. Continuing the same problem, in SOF ¶4, Plaintiffs cited to the actual testimony of Ms. Tarver for the point that she testified that she could only assume that Ocwen, the prior servicer – had failed to collect some amount of escrow. Plaintiffs included her actual testimony. There is no dispute possible.

5. through 12. Freedom does not substantively dispute any of the facts stated in SOF ¶¶5-12. Most importantly, Freedom does not dispute that its entire "default" assertion was based on the escrow shortage claim – that the Parkers should have paid property tax even though they were exempt. Freedom's accuracy defense boils down to one claim: that the previous servicer must have been wrong when it failed to collect property tax from the property tax exempt-Parkers.

Remarkably, the Defendant admits these (and other) facts showing that despite its summary judgment argument, it certainly knew and understood – as reflected in its own account notes – that the Parkers disputed its reporting of the pre-2016 escrow balance as a basis for default.

5

13. Defendant disputes the amount that the Parkers were to have paid based solely on its own assertion – its bootstrap or circular position – that that Parkers loan amount was increased because Freedom said it was increased. As above, there is no material dispute that the basis for the payment increases – the pre-2016 escrow of tax payments – was wrong.

14. Freedom admits the obvious point that the Parkers were not required to escrow tax payments when they did not have to make tax payments to the City of Newport News.

15. Freedom claims to dispute the testimony of its Rule 30(b)96) testimony because it came as a result of questioning by Plaintiffs' counsel. The testimony and facts offered remain undisputed. The increased payments demanded were calculated by Freedom based on the erroneous pre-2016 escrow makeup added, $101.06.

16. Freedom does not dispute that the Parkers did not receive a bill without this makeup escrow amount.

17. Freedom does not dispute that as soon as its removed the "pre-2016" tax escrow amount it had demanded, the Parkers payments matched the payments demanded for the 2016+ period.

18. Freedom's admission of the stated facts in SOF ¶18 is dispositive. It cannot deny that the amount actually owed was objectively determinable. And it does not even attempt to respond to the fact that its own documents showed the amount of tax and insurance payment actually paid out by Freedom.

19. Freedoms response to SOF ¶19 is unclear. It does not attempt to answer that its own Rule 30(b)(6) testimony confirmed that the actual amount of the Parkers' payment, absent the Defendant's erroneous pre-Freedom (pre-2016) tax demand was the same amount or less than what the Parkers actually paid.

20. and 21. Freedom admits the simple allegation that it was previously sued over its earlier reporting of its same escrow miscalculation, which it settled in May 2017.

22. Defendant does not dispute the statements of fact in SOF ¶22 that the Parkers paid the amount that they could best determine for April 2017 and May 2017 based on Freedoms then-ongoing inaccurate billing. It also admits and does not dispute in SOF ¶22 that even if the payments for these two months were off by a few dollars (because of Freedom's recent claim that the interest increase was also included), this small balance was paid in full by the much more substantial credit required under the 2017 Settlement Agreement.

23. Freedom cannot dispute the actual text in the 2017 Settlement Agreement, at paragraph 3, requiring it to correct its credit reporting and reflect that there was no outstanding balance owed after the 2017 Settlement Agreement.

24. through 27. Freedom does not dispute that its Rule 30(b)(6) witness could not provide any evidence that its numbers were accurate. It cannot dispute that it has demanded even inconsistent amounts after the 2017 Settlement Agreement.

28. Freedom does not attempt to dispute the specific facts cited in SOF ¶28 – that the Parkers have repeatedly disputed that they owed any default balance, including the shifting $559.30 or $599.30 amounts.

29. Freedom does not dispute the facts in SOF ¶29 including that the Parkers' bank records show they made regular and timely monthly payments as due.

30. Freedom admits that "the Parkers' 'regular payment' after June 2017 was $818.48" and that the "Parkers timely paid that amount each month by automatic bank payment."

31. and 32. Freedom admits that it demanded three different balance amounts between June 2017 and the end of August 2017.

33. In SOF ¶33, Freedom admits that it has never in this case provided any explanation or evidence of where this post-June 2017 amount came from.

34. Dispositive as to Defendant' legal argument below that it never received notice of Plaintiffs' disputes, in SOF ¶34, it does not (and cannot honestly) dispute that actually received an electronic copy of the same dispute letters Plaintiffs sent to the credit bureaus in 2018.

35. Freedom does not dispute that its dispute agents take only 9 minutes for each FCRA dispute received.

36. Freedom does not dispute with any actual support that its dispute agents make less than $15 per hour.

37. Freedom does not dispute that its dispute agents do not use a telephone in conducting FCRA disputes.[4]

38. And it admits that it does not contact any consumer or outside source in processing consumer disputes.

39. through 43. Defendant cannot dispute the substance of its dispute agents' testimony detailing what they do (and do not do) when processing consumer FCRA disputes. Plaintiffs cited the actual deposition testimony.

44. Dispositively, Freedom does not dispute that the industry guideline "provided to Freedom by the CRAs details the proper way to respond to an ACDV and in particular how to use a field labeled, Compliance Condition Code or 'CCC' and that the "proper code for an account that remains in dispute is 'XB,' which indicates, 'Account information disputed by consumer under

---

4 Within its SOF ¶37 response, Freedom somehow suggests that it received only a single ACDV dispute in 2018. That is patently false. In fact, it received multiple ACDV disputes for both Mr. Parker and Mrs. Parker from multiple consumer reporting agencies.

the Fair Credit Reporting Act.'" It does not dispute that if "that code is used, there is no derogatory impact on the consumer's credit score."

45. Freedom's response to SOF ¶45, and its new argument generally, is unclear. It seems to suggest that the Parkers had some obligation to go back again to the Defendant after they made the 2018 FCRA disputes and again tell the Defendant that they continued to dispute the same inaccurate credit reporting. There is of course no such obligation – the FCRA cause of action arose when Freedom reported its response that it had determined its account was not disputed.

However, for present purposes, Defendant does not dispute in response to SOF ¶45 the fact that it understood that the "Parkers disputed the status and reported history of the account that Freedom was reporting."

46. Freedom's response to SOF ¶46 is puzzling. It does not respond because it claims this is somehow a "legal position." Defendant does not dispute the facts that "Freedom testified that it *never* reports a dispute status in its responses to the CRA."

47. Defendant does not dispute the SOF ¶47 facts that Freedom already knew from the May 2016, August 2016 and April 2018 disputes that they disputed Freedom's inaccurate credit reporting.

48. through 50. Defendant does not dispute the facts stated that it receives the Parkers' FCRA disputes through the credit bureaus online system and that the electronic form accompanying the disputes is called an "ACDV."

51. Freedom does not dispute that its "dispute agents merely accepted, and returned substantively unchanged" its reporting after each dispute.

52. and 53. Defendant admits the facts in SOF ¶¶52 and 53, that it very rarely changes its reporting in response to consumer disputes and even now insists it never made a mistake in how it handled the Parkers' account.

### III. FREEDOM HAS FAILED TO ANSWER PLAINTIFFS' EVIDENCE THAT ITS REPORTING OF THEIR ACCOUNT STATUS WAS INACCURATE.

**A. There Is No Escrow Analysis To Support Freedom's Arguments.**

As Plaintiffs have presented evidence that Freedom inaccurately reported their account as delinquent because it had no factual basis for concluding that Plaintiffs owed anything more than what they paid Freedom, the burden passes to Freedom to provide more than a scintilla of evidence to the contrary. *Joyner v. O'Neil*, No. 3:10-cv-406, 2012 WL 560199, at *2 (E.D. Va. Feb. 21, 2012). Despite having this burden, Freedom has offered no evidence that Plaintiffs were indeed delinquent. It instead retreats to the figures contained in its account records but, as Plaintiffs set out in their opening memorandum and Statement of Undisputed Facts on this Motion as well as their Opposition to Freedom's Motion for Summary Judgment, the evidence repeatedly shows that Freedom's internal records do not in any way accurately reflect the status of Plaintiffs' account. (*See, e.g.*, ECF 131 at 3 ¶ 2, 4 ¶¶ 3–4, 5 ¶ 7, 6 ¶ 9.) And Freedom has not shown otherwise. With discovery in this case complete and two motions for summary judgment briefed, all Freedom has been able to substantively state is, essentially, "there is this dollar amount that was contained in the former servicer's records and which we never verified, that we adopted and carried over into our records as a supposed past-due amount on Plaintiffs' mortgage account. Plaintiffs therefore owe that amount." As Plaintiffs have shown, however, merely claiming that an amount is due does not make it so, particularly where Freedom has habitually made mistakes with Plaintiffs' account, cannot show the basis of its figures, and those figures change with each letter sent to Plaintiffs

prior to this case being filed or the brief filed in this Court. Unable to raise a fact issue regarding the accuracy of its reporting of Plaintiffs as in default, let alone prove the accuracy of its records and therefore credit reporting, Freedom likewise has not, indeed cannot, counter Plaintiffs' evidence that Freedom's reporting of Plaintiffs' account as delinquent was objectively inaccurate.

Setting aside factually unsupported arguments, the centerpiece of Freedom's defense is a document that does not exist. Freedom repeatedly claims that its figures regarding Plaintiffs' account are validated by a supposed escrow analysis that it performed in 2015 and 2016. (ECF 145-1 ¶¶ 1, 5.) The lack of Plaintiffs' questioning of Freedom's Rule 30(b)(6) witness using this analysis document is also Freedom's primary basis for supposedly countering Plaintiffs' evidence that Freedom's account figures are inaccurate and unverifiable. (*Id.* ¶ 2.) Yet, through all of the discovery in this case and motions practice related thereto, Freedom has never produced any escrow analysis it supposedly conducted. It has therefore based its defense on something that it is either improperly withholding under Rule 26(e) or 37(c)(1) or does not exist. Whatever the case, with discovery now long closed Freedom has no escrow analysis on which to base any of its arguments that its reporting was somehow accurate. The Court should therefore conclude that Freedom has failed to appropriately rebut Plaintiffs' inaccuracy arguments.

B.    **Plaintiffs Do Not Raise A Legal Challenge To Their Account Status.**

Freedom likewise posits the incorrect argument that Plaintiffs' accuracy challenges are not factual but, rather, are legal in nature. (ECF 145 at 5.) Because Plaintiffs claim that they did not owe the amounts Freedom claims were delinquent, the argument goes, they are asserting legal challenges to the status of their account rather than mere claims that the reporting is factually inaccurate. (*Id.*) Such argument is based on a line of cases which have concluded that the legal standing of something reported about an account—such as, for example, whether a loan is a valid

one—are not appropriately challenged as being inaccurate under Section 1681s-2(b). (*Id.*) Yet that is not the type of challenge to Freedom's reporting of their account status Plaintiffs lodge here.

Plaintiffs do not assert a legal challenge to an amount supposedly due under their mortgage. Instead, their claim stems from Freedom's reporting of their account as delinquent when it had no basis—no provable, factual reason—for so stating. Freedom reported Plaintiffs as delinquent when, as Plaintiffs have repeatedly explained and provided evidence to support, they paid all of their payments on time and in the appropriate amount. Freedom has no factual basis, and has not been able to contrive one over the course of this litigation, for reporting Plaintiffs as delinquent.

Freedom hopes to support its arguments by directing the Court to the settlement of Plaintiffs' first lawsuit against Freedom, claiming Plaintiffs have released their claims. (ECF 145 at 5.) Such arguments are of course unsupported by the record evidence here and confirmed by the fact that Freedom has failed to move for summary judgment on the basis of the supposed release. (*See* ECF 96 at 2 (suggesting that Plaintiffs have released their claims, yet not raising release as a grounds for judgment as a matter of law).) Put differently, if Freedom had any confidence at all in its defense of release, Freedom would have properly raised it as a basis for summary judgment. Freedom's failure to do so tells the Court everything it needs to know about the validity of the supposed release.

More to the point, Plaintiffs have not raised any claim relating-to or settled-by their former lawsuit. All of Plaintiffs' current claims and facts supporting them, such as the communication of their disputes to the CRAs, occurred after the 2017 settlement of Plaintiffs' first case against Freedom. (ECF 1 ¶¶ 16–31.) Nothing to which Freedom points shows otherwise, again confirming that its arguments regarding a release are mere misdirection. The Court should therefore refuse to consider them.

## IV. FREEDOM HAS NOT SHOWN IT CONDUCTED ANY INVESTIGATION, LET ALONE A REASONABLE ONE.

Freedom argues that Plaintiffs' investigation arguments fail because they purport to invoke a standard "which is not supported by the case law" because, according to Freedom, "[w]hen the information provided to a furnisher suggests that a consumer is disputing a debt generally, without specific claims as to why a reported debt is inaccurate, the furnisher satisfies its duty to conduct a reasonable investigation by verifying that the information in its records is identical to that provided by a credit reporting agency." (ECF 145 at 6 (citing *Alston v. Trident Asset Mgmt., LLC*, No. 18-575, 2019 WL 2525378, at *4 (D. Md. June 18, 2019)).) All Freedom must do, it argues, is verify the information it is reporting when it receives an ACDV. (*Id.*)

As an aside, it appears that Freedom even now does not really understand the FCRA or the cases its has come across to draft its brief. It claims that the case law allows an "ACDV" investigation. Okay. What that would mean is – obviously and unremarkably – cases have not held that conveying a consumer's dispute electronically from the CRA to the creditor/furnisher through the online "e-Oscar" system is somehow unlawful. Of course, it is not. In fact, every dispute in 2018 to every furnisher from every Big-3 CRA was conveyed that way. That would be like arguing that case law allows receiving consumer disputes by mail is lawful. An "ACDV" is merely a way to communicate the consumer's dispute to the creditor. It does not address what the furnisher does with the dispute after receipt.

It is also important to note how brazen it is for a party to argue a legal question when there is on point case law from the Fourth Circuit without even mentioning those decisions. For example, the Court of Appeal's decision, *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426 (4th Cir. 2004), remains the seminal case in this field and is never discussed in Defendant's brief.

13

The *pro se*-plaintiff cases on which Freedom relies for this principle say nothing of the kind. The *Alston* court was considering whether a furnisher adequately investigated a dispute where the consumer never stated the nature of his dispute dispute, facts not at issue here. *Alston*, 2019 WL 2525378, at *4. The court concluded that in that instance, not knowing about the claim of identity theft, the furnisher had no obligation to investigate further than the information contained in its computer system. Nothing like that occurred here.

Similarly, in *Kelly v. Suntrust*, this Court did not merely hold that all furnishers must do is follow the ACDV process and they never violate Section 1681s-2(b). (*See* ECF 145 at 6.) Instead, the Court in *Kelly* emphasized the requirements of *Johnson* that "[a] consumer challenging a furnisher's reinvestigation efforts must show that the furnisher failed to act with a 'degree of careful inquiry' to ensure accurate information." *Kelly v. SunTrust Bank*, No. 3:14-cv-121, 2016 WL 775781, at *4 (E.D. Va. Feb. 25, 2016), *aff'd*, No. 16-1310, 2016 WL 7030641 (4th Cir. Dec. 2, 2016). As Freedom readily admits in its brief, it conducted no searching inquiry into Plaintiffs' disputes—it merely checked its account-history figures (the source of the inaccurate information Plaintiffs were disputing) and parroted that information back to the CRAs. (ECF 145 at 6–7.) This comes nowhere near the *Johnson* standard of an inquiry designed to actually turn up information that may prove the dispute is a valid one and which requires correction of the furnisher's reporting. And Freedom directs the Court to no case showing otherwise.

Freedom's arguments also inappropriately simplify "the ACDV process," as really all that "process" comprises is the electronic passing of dispute information back and forth between the CRAs and furnishers. *See Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 429 (4th Cir. 2004) (explaining the process). So to say that all Freedom must do is blindly participate in the ACDV process to have conducted a reasonable investigation takes the *Johnson* standards out of the

14

equation altogether. Siding with Freedom would also rubber-stamp a furnisher's complete failure to conduct any investigation whatsoever, an outcome *Johnson* clearly forbids.

This Court has recognized just the problem with this argument by Freedom, noting in *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 851 (E.D. Va. 2017), that the contents of an ACDV do not necessarily circumscribe the furnisher's investigation duties. To the contrary, as the Court explained, "a furnisher may not 'truncate its investigation simply because the CRA failed to exhaustively describe the dispute.'" *Id.* (quoting *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1306 (11th Cir. 2016)). And that conclusion makes complete sense, as it is widely known that the CRAs put little substance into ACDVs, charging their employees who process them to attempt only to cram the description of the dispute into one of a few categories of codes that are designed to speed-up the information-transfer process. *See id.* at 839 (describing the plaintiff's ACDVs to Credit One and noting "[e]ach of the disputes was submitted with a dispute code of '103: Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID.'").) Put simply, the polar opposite of Freedom's argument is the norm—furnishers cannot pass the investigation buck by claiming it did all it could with the paucity of information the CRA provided. Section 1681s-2(b) imposes upon furnishers like Freedom its own set of investigation obligations, which Freedom must carry-out with the *Johnson* standards as their guide. Here Freedom came nowhere close, engaging in a perfunctory data-match that, as Plaintiffs point out in their opening brief, has been held insufficient by multiple courts. (ECF 131 at __.)

Freedom also hopes to distinguish the District and Circuit caselaw by arguing factual distinctions that make no difference to the Court's analysis or raising issues wholly unsupported by Freedom's citations. For instance, contrary to Freedom's arguments, an investigation's reasonableness is not directly tied to the number of disputes. (ECF 145 at 7.) Instead, *Johnson*

15

applies to a single dispute, and additional disputes merely affirm the unreasonableness of the investigation and the furnisher's willful failure to comply with the statute and *Johnson*. And where the furnisher is, like here, an original creditor, the evaluation of the dispute changes and demands greater scrutiny by the furnisher because Freedom has more information related to the disputed account than would, say, a debt buyer or someone else similarly removed from the original creditor-debtor relationship. *Wood*, 277 F. Supp. 3d at 851 ("Further, '[w]hether a furnisher's investigation is reasonable will depend in part on the status of the furnisher—as an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer—and on the quality of documentation available to the furnisher.'"). Here, Freedom had all of the account record, payment, tax-exemption, prior dispute, prior lawsuit, and settlement information available to it when it received Plaintiffs' disputes, and consulted none of that information in processing those disputes. Despite having this wealth of information—more information than anyone involved in the dispute process—and a legal obligation to refer to it as part of the dispute process, Freedom simply regurgitated its inaccurate reporting back to the CRAs.

Likewise, there is no "heightened" investigation standard that applies to identify-theft disputes. (*Id.*) Freedom makes such argument to broadly sweep away several cases Plaintiffs cite, such as this Court's *Wood* decision, but that effort fails. As to *Wood*, Freedom claims that case is inapplicable because the investigation there was held unreasonable "only under a set of facts where the consumer 'continued to dispute the Account for years, claiming identity fraud.'" (ECF 145 at 7 (quoting *Wood*).) Whether an investigation is reasonable under Section 1681s-2(b) is case-dependent, with the Court charged with determining reasonableness based on what a furnisher did in response to the disputes at issue in a particular case. *Johnson*, 357 F.3d at 430 ("Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors."). So while

16

courts may have held that investigations involving claims of identity theft include paramaters not at-play in other circumstances, the *Johnson* "detailed inquiry or systematic examination" applies regardless of the substance of the dispute. Freedom again fails to show otherwise.

Freedom's remaining arguments attempt to recast Plaintiffs' positions to the extreme. For example, Plaintiffs do not argue that Freedom was obligated to call Plaintiffs in investigating their disputes. (ECF 145 at 8.) Rather, Plaintiffs merely posit that such is a step Freedom may take should it have a desire to actually investigate rather than do nothing other than data match the payment history in its error-riddled system with that which it reports to the CRAs. (*See* ECF 131 at 11–14 (setting out rampant failures of Freedom's investigation process).) Plaintiffs set forth a host of problems with Freedom's investigation procedures, which Freedom does not genuinely address in its brief. (*See id.*)

## V. FREEDOM'S ARGUMENTS THAT IT HAD NO OBLIGATION TO MARK THE ACCOUNT AS DISPUTED FAIL.

All Freedom can meaningfully say on this point— "Freedom Mortgage was unaware of an on-going dispute" that would trigger the requirement that it note the account as disputed to the CRAs—is false. (ECF 145 at 10.) Of course, Freedom was aware of a dispute, as it received ACDVs from the CRAs indicating the nature of Plaintiffs' disputes. Such disputes stretched back to 2016 (ECF 131 at 13 ¶ 47), and Freedom cannot reasonably argue that the 2016 and 2018 disputes were in any way distinguishable in its system because, while the 2016 disputes related to the settlement reached in 2017, none of its ACDV operators are able to find out about the existence or settlement of an earlier lawsuit. (*Id.* at 12 ¶ 42.) While Freedom hopes to distinguish *Wood* because that case involved multiple disputes, this one did too. Freedom just refuses to acknowledge as much.

Freedom further does not explain what triggers the duty to mark an account as disputed, arguing instead that "[t]here simply was no notice in this case of a bona fide dispute of the account until the Complaint was filed." (ECF 145 at 10.) If that were the standard, no furnisher would ever have to report an account as disputed until a lawsuit is filed. Yet Freedom appears to have adopted this violative standard it has invented, as it is undisputed that Freedom *never* reports an account as disputed to the CRAs. (ECF 131 at 13 ¶ 46.) So whatever number of disputes or other event may be needed to cause a furnisher to report an account as disputed, Freedom would never so report. And Freedom does not in any way counter that it never reports accounts as disputed, regardless of how much notice it has of a dispute. (ECF 145 at 9–11.) The Court should therefore have little difficulty finding in favor of Plaintiffs on this issue.

### VI. CONCLUSION.

For the reasoned stated herein and those previously briefed, the Court should grant Plaintiffs partial summary judgment as to their FCRA claims against Freedom.

Dated: January 3, 2020.

Respectfully submitted,
**JAMES T. PARKER, II and**
**DEBRA L. PARKER,**

By: /s/
    Counsel
Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
Elizabeth W. Hanes, VSB #75574
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

*Counsel for Plaintiff*